IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| QWEST CORPORATION,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>PUBLIC SERVICE COMMISSION OF UTAH; et al.,<br><br>　　　　　　Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:04-CV-1136 TC |

　　　　This case involves a dispute between telecommunications carrier Qwest Corporation and the Public Service Commission of Utah ("Commission") over the public filing requirements of the Federal Telecommunications Act of 1996 (the "Act"). Under the Act, Congress gave limited authority to state utility regulatory agencies like the Commission to review and approve (or reject) certain types of agreements between private telecommunication companies, such as Qwest.

　　　　In July 2004, Qwest entered into a commercial agreement with MCIMetro Access Transmission Services LLC ("MCIMetro") to provide telecommunications network services to MCIMetro (the "Commercial Agreement"). Based on the Act's filing requirements, MCIMetro filed an application with the Commission for review and approval of the Commercial Agreement.

　　　　Qwest filed a motion with the Commission requesting dismissal of MCIMetro's application, asserting that the Commission's review authority under the Act did not extend to the

subject matter of the Commercial Agreement (i.e., voluntary, not obligatory, provision of network services).

The Commission denied Qwest's motion in a September 30, 2004 Order ("PSC Order"), holding that the Commercial Agreement was properly filed with the Commission and could be reviewed for approval or rejection. The Commercial Agreement was subsequently approved by operation of law.

Still, Qwest appealed the PSC Order to this court, challenging the Commission's exercise of authority under Section 252 of the Act.[1] The court, having determined that the Commission's exercise of authority was consistent with the Act's plain language and underlying purpose, AFFIRMS the PSC Order and DENIES Qwest's request for declaratory and injunctive relief.

## BACKGROUND

In 1996, Congress enacted the Federal Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 151 et seq. ("the Act"). The Act:

> "fundamentally change[d] telecommunications regulation" by introducing competition in the local service market. Prior to the Act, telephone service was a regulated monopoly, in which incumbent providers enjoyed protection from new companies entering the market. The Act sought to "remove the outdated barriers that protect monopolies from competition and affirmatively promote efficient competition." Under the Act, incumbent local exchange carriers ("ILECs"), ones which previously had enjoyed a monopoly over the provision of local telephone service, acquired affirmative duties.

Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713, 715 (10th Cir. 2002) (internal citations

---

[1] Qwest, explaining its position, states that its appeal of the PSC Order "is not to suggest that the Commission should have rejected the Commercial Agreement. The point is that the Commission does not have the power to either approve or reject the Commercial Agreement; thus, the Commission's action of approving the Commercial Agreement by operation of law exceeded its delegated authority under the Act." (Qwest's Opening Br. at 3 n.10.)

omitted).  Qwest is an ILEC.  "To enable new firms to enter the field despite the advantages of the [ILECs], the Act gave the Federal Communications Commission [the "FCC"] broad powers to require ILECs to make 'network elements' available to other telecommunications carriers, most importantly the competitive local exchange carriers ('CLECs')."  United States Telecom Ass'n v. FCC, 359 F.3d 554, 561 (D.C. Cir. 2004) (hereinafter referred to as "USTA II") (internal citation omitted).  MCIMetro is a CLEC.

On July 16, 2004, Qwest and MCIMetro contemporaneously entered into two agreements.  The first was the Commercial Agreement, a privately negotiated agreement in which Qwest agreed to provide certain network elements (i.e., switching and shared transport elements) to MCIMetro.  The second agreement was the Interconnection Agreement Amendment, in which Qwest agreed to provide a different network element (i.e., a "loop" element) to MCIMetro.

Under the Act, as recently interpreted by courts and the FCC, Qwest is not obligated to provide switching or shared transport elements under Section 251 because they are not "unbundled network elements" (UNEs).  See 47 U.S.C. § 251(c)(3) (requiring access to certain UNEs); USTA II, 359 F.3d at 571, 588 (noting that switching and shared transport elements are not UNEs); FCC Order on Remand in the Matter of Unbundled Access to Network Elements, WC Docket No. 04-313 and CC Docket No. 01-338, 20 FCC Rcd. 2533 (Feb. 4, 2005) (hereinafter "Triennial Review Remand Order" or "TRRO") ¶ 199 ("[W]e impose no section 251 unbundling requirement for mass market local circuit switching nationwide.").  Qwest does not dispute, however, that it is obligated to provide the unbundled loop element under Section 251 of the Act because it is a UNE.  (See Qwest's Opening Br. at 20.)

On July 27, 2004, MCIMetro filed both agreements with the Commission based on

Section 252(a)(1) of the Act. That provision, dealing with filing requirements for agreements arrived at through voluntary negotiations, contains the following language:

> Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

47 U.S.C. § 252(a)(1). Subsection (e) of Section 252 provides that approval by the state commission is required for interconnection agreements: "Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies." 47 U.S.C. § 252(e)(1).

On August 13, 2004, Qwest moved to dismiss MCIMetro's application for approval of the Commercial Agreement, arguing among other things that agreements like the Commercial Agreement, which addresses network elements not required by section 251, are not subject to the jurisdiction of the Commission. Qwest did not challenge MCIMetro's filing of the Interconnection Agreement Amendment because that agreement addresses a required network element under Section 251(c)(3) of the Act.

Qwest bases its argument, in part, on language contained in an October 4, 2002 FCC Declaratory Order[2] which, Qwest asserts, definitively establishes the filing standard under section

---

[2]The full citation for the FCC Declaratory Order is <u>In the Matter of Qwest Communications International, Inc. Petition for Declaratory Ruling on the Scope of the Duty to</u>

252. Interestingly, the Commission also relies on language in the Declaratory Order, but it relies on the Declaratory Order to support a position contrary to Qwest's position. The language of the Declaratory Order will be set forth and discussed in more detail below.

On September 20, 2004, the Commission issued its final order denying Qwest's motion and rejecting Qwest's argument that the Commercial Agreement need not be filed. After the Commission rejected Qwest's motion, Qwest filed an appeal of the Commission's Order, which is the matter now facing the court.

## ANALYSIS

In this appeal, Qwest seeks an order (1) declaring that the Commercial Agreement is not subject to filing, review, or approval or disapproval by the Commission under section 252 of the Act, and (2) requiring the Commission to vacate the PSC Order. The Commission, on the other hand, has affirmatively asked the court to affirm the Commission's decision that the Commercial Agreement was properly filed with and approved by the Commission.[3]

**Jurisdiction and Standard of Review**

The court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and 47 U.S.C. § 252(e)(6) ("In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal

---

File and Obtain Prior Approval of Negotiated Contractual Agreements under Section 252(a)(1), WC Docket No. 02-98, 17 FCC Rcd 19337 (Oct. 4, 2002).

[3] The Commission also seeks a declaration that other interconnection agreements dealing with ongoing obligations for interconnection services or network elements are to be filed and are subject to review for approval or rejection pursuant to § 252(e). The Commission did not file a counterclaim for declaratory judgment (see Defs.' Answer), so the court will not grant declaratory relief to the Defendants. Also, the Commission seeks an advisory opinion, which the court declines to issue.

district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section."). See also 47 U.S.C. § 252(e)(4) ("No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.").

The court reviews the Commission's decision interpreting the Act and the Act's implementing regulations *de novo*. Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713, 717 (10th Cir. 2002).

**Relevant Statutory and Regulatory Authority**

**Federal Telecommunications Act of 1996**

*Language of the Act*

In general, Section 251(a) of the Act requires all telecommunications carriers to enter into "interconnection agreements" for leasing of network elements. Global NAPs, Inc. v. Verizon New England, Inc., 396 F.3d 16, 18 (1st Cir. 2005); Verizon North, Inc. v. Strand, 367 F.3d 577, 581 (6th Cir. 2004). Section 251(a) defines the "general duty of telecommunications carriers" to include the duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a). Sections 251(b) and (c) of the Act set forth more specific obligations of ILECs.

In Section 252, the Act sets forth procedures relating to agreements arrived at through voluntary negotiation.[4]

> Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an [ILEC] may negotiate and enter into a

---

[4]Arbitrated agreements are subject to different standards. See 47 U.S.C. §§ 252(b), (c).

> binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. . . . The agreement . . . shall be submitted to the State commission under subsection (e) of this section.

47 U.S.C. § 252(a)(1) (emphasis added). According to that language, when the CLEC seeks access from the ILEC, the ILEC may voluntarily negotiate an agreement without regard to the duties it would otherwise have under sections 251(b) and 251(c). US West Comm., Inc. v. Sprint Comm. Co., LP, 275 F.3d 1241, 1244 (10th Cir. 2002) (citing § 252(a)(1)). But if those private negotiations fail, either party may seek arbitration by the state commission, in which case specific standards enumerated under sections 251(b) and 251(c) must be followed. 47 U.S.C. §§ 252(a), (b).

In either case, Section 252(e)(1) requires that "[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission." 47 U.S.C. § 252(e)(1) (emphasis added). The state commission may reject an agreement for very limited reasons, such as a finding of discrimination against a telecommunications carrier not a party to the agreement or a finding that all or part of the agreement is not consistent with public interest, convenience, and necessity. See 47 U.S.C. § 252(e)(2).

### *Congressional Intent and Purpose of the Act*

Generally, Congress designed the Act to encourage the development and growth of competitors in the telecommunications market. The Act achieved its goal of increasing market competition by, among other things, imposing a number of duties upon ILECs, including the ILEC's duty to share its network with CLECs. Congress also set up mechanisms to prevent ILEC discrimination against less favored CLECs, including Section 252's filing and state

commission approval requirement.

The filing and state commission approval requirement, which results in public disclosure of the terms of agreements between an ILEC and a CLEC, ensures that ILECs do not discriminate against CLECs that are not parties to the agreement. Similarly, it gives the CLECs that are not parties to the agreement the opportunity to resist discrimination by allowing them to fully evaluate and request the same terms given to the contracting CLEC.[5]

> Once submitted, if an interconnection agreement is approved by the state commission, other carriers may also adopt the terms and conditions or the rates in the agreement pursuant to section 252(i) [of the Act]. Through this mechanism, competitive carriers avoid the delay and expense of negotiating new agreements with the incumbent LEC and then awaiting state commission approval. Absent such a mechanism, "the nondiscriminatory, pro-competition purpose of section 252(i) would be defeated . . . ."

<u>FCC Notice of Apparent Liability for Forfeiture in the Matter of Qwest Corporation</u>, 19 FCC Rcd. 5169, ¶ 20 (internal citations omitted) (hereinafter "FCC Forfeiture Order").

**FCC's First Report and Order of 1996**

After Congress enacted the Federal Telecommunications Act, the FCC issued its <u>First Report and Order In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996</u>, CC Docket No. 96-98 and <u>In the Matter of Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers</u>, CC Docket No. 95-185, FCC 96-325, 11 FCC Rcd 15706 (1996) (hereinafter "First Report and Order").[6] In the First Report and Order, the FCC concluded as follows:

---

[5] 47 U.S.C. § 252(i) permits carriers to "opt in" to an interconnection agreement that has been entered into by other carriers.

[6] The First Report and Order is also known as the "Local Competition Order." (<u>See, e.g.</u>, Defs.' Response Br. at 8.)

> [T]he 1996 Act requires <u>all</u> interconnection agreements "including any interconnection agreement negotiated before the date of enactment of the Telecommunications Act of 1996" to be submitted to the state commission for approval pursuant to section 252(e).  The 1996 Act does not exempt certain categories of agreements from this requirement. . . .  Congress intended, in enacting sections 251 and 252, to create opportunities for local telephone competition.  We believe that this pro-competitive goal is best effected by subjecting <u>all</u> agreements to state commission review.

First Report and Order ¶ 165 (emphasis added).[7]  The FCC also offered its interpretation of Section 252(a) by concluding that "the final sentence of section 252(a)(1), which requires that any interconnection agreement must be submitted to the state commission, can and should be read to be <u>independent</u> of the prior sentences in section 252(a)(1)."  <u>Id.</u> ¶ 166 (emphasis added).  That is, even if an agreement is voluntarily negotiated without regard to the standards in subsections (b) and (c) of section 251, the agreement shall be submitted to the state commission for review.

**FCC's October 4, 2002 Declaratory Order**

On October 4, 2002, the FCC issued a Declaratory Order in response to a petition from Qwest for a declaratory ruling on the scope of the mandatory filing requirement set forth in section 252(a)(1) of the Act.  "Specifically, Qwest [sought] guidance about the types of negotiated contractual arrangements between [ILECs and CLECs] that should be subject to the filing requirements of section 252(a)(1)."  FCC Declaratory Order at 1.  In Qwest's petition, it

---

[7]<u>See also</u> First Report and Order ¶ 167 ("As a matter of policy, moreover, we believe that requiring filing of all interconnection agreements best promotes Congress's stated goals of opening up local markets to competition, and permitting interconnection on just, reasonable, and nondiscriminatory terms.  State commissions should have the opportunity to review <u>all</u> agreements, including those that were negotiated before the new law was enacted, to ensure that such agreements do not discriminate against third parties, and are not contrary to the public interest.") (emphasis in original).

asserted that

> the following categories of [ILEC-CLEC] arrangements should <u>not</u> be subject to section 252(a)(1): (i) agreements defining business relationships and business-to-business administration procedures (<u>e.g.</u>, escalation clauses, dispute resolution provisions, arrangements regarding the mechanics of provisioning and billing, arrangements for contacts between the parties, and non-binding service quality or performance standards); (ii) settlement agreements; and (iii) agreements regarding matters not subject to sections 251 or 252 (<u>e.g.</u>, interstate access services, local retail services, intrastate long distance, <u>and network elements that have been removed from the national list of elements subject to mandatory unbundling</u>).

<u>Id.</u> ¶ 3 (emphasis added) (quoting Qwest's Petition Br.).  Qwest's mention of the removal of network elements from the national list of elements subject to mandatory unbundling refers to an earlier FCC decision responding to a D.C. Circuit order remanding the issue of unbundled elements for re-working.  <u>See, e.g.</u>, <u>USTA II</u>; TRRO ¶ 199.[8]

The FCC granted Qwest's petition in part and denied it in part.  The FCC, in its analysis of the statutory language, found that

> <u>an agreement that creates an *ongoing* obligation pertaining to resale, number portability, dialing parity, access to rights-of-way, reciprocal compensation, interconnection, unbundled network elements, or collocation is an interconnection agreement that must be filed pursuant to section 252(a)(1)</u>. [fn26] This interpretation, which directly flows from the language of the Act, is consistent with the pro-competitive, deregulatory framework set forth in the Act. . . . We therefore disagree with Qwest that the content of interconnection agreements should be limited to the schedule of itemized charges and associated descriptions of the services to which the charges apply.  Considering the many and complicated terms of interconnection typically established between an incumbent and competitive LEC, we do not believe that section 252(a)(1) can be given the cramped reading that Qwest proposes.  Indeed, <u>on its face, section 252(a)(1) does not further limit the types of agreements that carriers must submit to state commissions</u>.

---

[8] Only certain network elements must be provided on an unbundled basis under § 251.  The statute gives the FCC the authority to issue regulations setting forth which unbundled network elements must be offered by the ILEC. 47 U.S.C. § 251(d).

FCC Declaratory Order ¶ 8 (underline emphasis added).  In footnote 26 of the Declaratory Order, the FCC stated:

> We therefore disagree with the parties that advocate the filing of *all* agreements between an incumbent LEC and a requesting carrier.  See Office of the New Mexico Attorney General and Iowa Office of Consumer Advocate Comments at 5.  Instead, we find that only those agreements that contain an ongoing obligation relating to section 251(b) or (c) must be filed under 252(a)(1). . . .

Id. ¶ 8 n.26 (underline emphasis added).  In footnote 26, the FCC rejected the commentors' very broad suggestion that all agreements between carriers, regardless of their relevance to Section 251, should be filed with the state commissions.

But the FCC further stated that "[i]n issuing this decision, however, we believe that the state commission should be responsible for applying, in the first instance, the statutory interpretation we set forth today to the terms and conditions of specific agreements." Id. ¶ 7.  The FCC continued by stating that

> [b]ased on their statutory role provided by Congress and their experience to date, state commissions are well positioned to decide on a case-by-case basis whether a particular agreement is required to be filed as an "interconnection agreement" and, if so, whether it should be approved or rejected. . . . Therefore, we decline to establish an exhaustive, all-encompassing "interconnection agreement" standard.  The guidance we articulate today flows directly from the statute and serves to define the basic class of agreements that should be filed.

Id. ¶ 10 (emphasis added).  See also FCC Forfeiture Order ¶ 34 ("After an agreement is filed with a state commission, the commission may approve or reject that agreement.  The state commission can advise the carrier whether a certain type of agreement is considered an interconnection agreement that requires filing in that state.  Until an agreement is filed, however, the state commission would not be in a position to approve, reject, or determine whether a certain type of agreement does not require filing.") (emphasis added) (interpreting Declaratory Order).

Finally, the FCC said that, "[c]onsistent with our view that the states should determine in the first instance which sorts of agreements fall within the scope of the statutory standard, we decline to address all the possible hypothetical situations presented in the record before us." FCC Declaratory Order ¶ 11. But the FCC did provide some guidance in the Declaratory Order by enumerating narrow exceptions to the mandatory filing and state commission requirements of section 252(a)(1). See Declaratory Order pp. 14-19. The FCC summarized those narrow exceptions in a subsequent order:

> (1) settlement agreements that simply provide for backward-looking consideration that do not affect an incumbent LEC's ongoing obligations relating to section 251; (2) forms completed by carriers to obtain service pursuant to terms and conditions set forth in an interconnection agreement; and (3) agreements with bankrupt competitors that are entered into at the direction of a bankruptcy court or trustee and that do not otherwise change the terms and conditions of the underlying interconnection agreement.

In the Matter of Application By Qwest Communications International Inc., for Authorization to Provide In-Region, InterLATA Services in Minnesota, WC Docket No. 03-90, 18 FCC Rcd. 13323, n.271 (citing Declaratory Order ¶¶ 9-14). See also FCC Forfeiture Order ¶ 23 ("The [Declaratory Order] noted some reasonable but narrow exceptions to the general rule that any agreement relating to the duties outlined in sections 251(b) and (c) falls within section 252(a)'s filing requirement.").

**FCC's August 20, 2004 Order and Notice of Proposed Rulemaking**

On August 20, 2004, the FCC released its Order and Notice of Proposed Rulemaking in the Matter of Unbundled Access to Network Elements, WC Docket No. 04-313, and Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, CC Docket No. 01-338, 19 FCC Rcd. 16783 (hereinafter "2004 NPR"). In the 2004 NPR, the FCC incorporated

> three petitions regarding <u>incumbent LEC obligations to file commercial agreements, under section 252 of the Act, governing access to network elements for which there is no section 251(c)(3) unbundling obligation</u>. To that end, [the FCC asked] should we properly treat commercially negotiated agreements for access to network elements that are not required to be unbundled pursuant to section 251(c)(3) under section 252, section 211, or other provisions of law?

2004 NPR ¶ 13 (emphasis added). The issue presented by the FCC in the above-quoted paragraph 13 is the very issue that Qwest claims was resolved in the FCC's Declaratory Order.

**The Commission's Position is Consistent With the Act's Plain Language and Purpose**

Qwest argues for a restrictive construction of Section 252 that covers only the filing of agreements that address compelled terms required under Section 251(b) and (c). (<u>See</u> Qwest's Opening Br. at 25-30.) But Qwest's interpretation of the Act is contrary to the Act's plain language and purpose.

None of the Act's provisions suggest that the filing and approval requirements apply only to select agreements. The language of section 252(e) is unambiguous. "<u>Any</u> interconnection agreement adopted <u>by negotiation</u> or arbitration <u>shall</u> be submitted for approval to the State commission." Qwest incorrectly asserts that section 252(e)'s language incorporates an unspoken limitation necessarily required by section 251 and section 252(a)(1). Section 252(a)(1) is clear:

> Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. <u>The agreement</u>, including any interconnection agreement negotiated before February 8, 1996, <u>shall</u> be submitted to the State commission under subsection (e) of this section.

(emphasis added).

Also, contrary to Qwest's assertion, the FCC has interpreted that language very broadly and has expressly stated that the last sentence of 252(a)(1) should be read independently of the rest of 252(a)(1)'s language.  See, e.g., First Report & Order ¶¶ 165-66; FCC Declaratory Order ¶ 8 ("on its face, section 252(a)(1) does not further limit the types of agreements that carriers must submit to state commissions").

> After an agreement is filed with a state commission, the commission may approve or reject that agreement.  The state commission can advise the carrier whether a certain type of agreement is considered an interconnection agreement that requires filing in that state.  <u>Until an agreement is filed, however, the state commission would not be in a position to approve, reject, or determine whether a certain type of agreement does not require filing.</u>

FCC Forfeiture Order ¶ 34 (emphasis added) (interpreting Declaratory Order); see also id. ¶ 33 ("Section 252(a)(1) does not condition filing on a state commission first telling a carrier that a certain agreement (which has not yet been seen) must be filed.").

Qwest unpersuasively argues that the Commercial Agreement is not an interconnection agreement.  Although the Act does not define "interconnection agreement," the language of the Act suggests that any agreement entered into by competing carriers that implicates issues addressed by the Act is an interconnection agreement.  The court does not believe that Congress intended to completely eliminate the statutory filing requirement (which is the first line of defense to avoid discrimination against CLECs) for certain agreements relating to interconnection.  Qwest's restrictive interpretation is contrary to the purpose of the Act because Qwest's construction of the Act's language would permit it to circumvent the protective mechanisms set up by Congress.

Moreover, Qwest's reliance on the FCC Declaratory Order's "ongoing obligation"

language is misplaced. In its Declaratory Order, the FCC describes very narrow exceptions to the filing requirement. Those exceptions address agreements that do not implicate the policy of the Act's interconnection requirements. As the Commission notes in its brief, "[t]he distinction between the State Defendants' and Qwest's understanding and application of the Declaratory Order's footnote 26 is that the State Defendants see it as a potential floor whereas Qwest sees it as an absolute ceiling on the need to file interconnection agreements." (Defs.' Response Br. at 14.) The court agrees with the Commission's reading and finds that the FCC's Declaratory Order is consistent, when read in its entirety and in light of later FCC statements regarding its holding, with the Act's language and purpose. In fact, Qwest's citation to the Declaratory Order loses strength in light of the FCC's 2004 NPR that raises the very issue that Qwest claims was definitively decided in the Declaratory Order.

Finally, a case in the Western District of Texas provides additional reasoning to support the Commission's interpretation. In Sage Telecom v. Public Service Comm'n of Texas, Case No. A-04-CA-364-SS (W.D. Tex. Oct. 7, 2004) (attached as Ex. 1 to Defs.' Response Br.), the court dealt with disputes regarding the filing requirement for a voluntary agreement between Sage Telecom and Southwestern Bell Telephone. The agreement included services and network elements, some of which were compelled network elements and some of which were not. Sage and Southwestern Bell opposed the filing of the entire agreement. They argued that only the portions of the agreement setting forth compelled network elements needed to be filed with the state commission. The Sage Telecom court rejected the parties' distinction between required network elements and non-obligatory network elements with respect to filing requirements.

Although the facts in Sage Telecom are not exactly the same as the situation faced here,

the reasoning in <u>Sage Telecom</u> is persuasive, particularly in light of the fact that Qwest and MCIMetro entered into <u>two</u> agreements on the same day – one dealing with compelled network elements (the Interconnection Agreement Amendment) and one dealing with non-obligatory elements (the Commercial Agreement). The <u>Sage Telecom</u> court rejected Sage's and Southwestern Bell's position because it was not supported by the text of the Act itself. <u>Sage Telecom</u> at 9. The <u>Sage Telecom</u> court also noted that the parties' suggestion that only contract provisions addressing compelled network elements need be filed "would allow the policy goals of the Act to be circumvented too easily." <u>Id.</u> at 7.

  As noted above, the Act provides two mechanisms to prevent discrimination. First, state-commission-approval provides administrative review to ensure that agreements do not discriminate against other carriers, and second, the public-filing requirement gives other carriers an independent opportunity to resist discrimination by having access to the terms and conditions obtained by the favored carrier. Under Qwest's interpretation of the filing requirements, carriers could circumvent these mechanisms. Carriers could simply place some of their agreed-upon terms and conditions in one agreement (to be withheld) and place terms and conditions for Section 251 compelled services or network elements in another agreement (to be filed). "If the public filing scheme could be evaded entirely by a CLEC's decision [to split up its agreement], the statute would have no hope of achieving its goal of preventing discrimination against less-favored CLECs." <u>Sage Telecom</u> at 8.

  The <u>Sage Telecom</u> court also rejected an alternative argument by the parties that mirrors the situation presented in this case. The court noted two problems with the filing of one agreement while withholding a related agreement. "First, § 252(e)(1) plainly requires the filing

of any interconnection agreement." Id. at 10.  Second, if only certain parts of the parties' agreement are known, the filing of only the Section 251 relevant documents "might fundamentally misrepresent the negotiated understanding of what the parties agreed." Id. at 11.  Without access to and review of all the terms and conditions of the parties' interconnection agreement, the state commission could not make an adequate determination under the discrimination or public interest tests.  That is, what might appear to be appropriate terms and conditions in the document dealing with Section 251 duties could be inappropriate when viewed in conjunction with terms and conditions in another document dealing with non-Section 251 duties.  Also, other carriers would not be able to judge and evaluate (not only in their monitoring role but for their own business decisions as participants in the market) the carriers' total arrangement.  Citing to Coserv Ltd. Liability Corp. v. Southwestern Bell Tel. Co., 350 F.3d 482 (5th Cir. 2003), the Sage Telecom court stated that

> the entire § 252 framework contemplates [that] non-§251 terms may play a role in interconnection agreements: "[b]y including an open-ended voluntary negotiations provision in § 252(a)(1), Congress clearly contemplated that the sophisticated telecommunications carriers subject to the Act might choose to include other issues in their voluntary negotiations, and to link issues of reciprocal interconnection together under the § 252 framework."

Sage Telecom at 15-16.

The court finds that the Commission's interpretation of the Act is consistent with the language of the Act as well as FCC's interpretation and implementation of the Act.  Accordingly, the court upholds the PSC Order.

**ORDER**

For the foregoing reasons, the PSC Order is AFFIRMED. Qwest's request for declaratory and injunctive relief is DENIED.

DATED this 14th day of November, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge